PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LIBERTARIAN PARTY OF VIRGINIA;
DARRYL BONNER,
        *Plaintiffs-Appellees,*

v.

CHARLES JUDD, in his official
capacity as member of the
Virginia State Board of Elections;
KIMBERLY BOWERS, in her official
capacity as member of the
Virginia State Board of Elections;
DON PALMER, in his official
capacity as member of the
Virginia State Board of Elections,
        *Defendants-Appellants.*

No. 12-1996

———

THOMAS JEFFERSON CENTER FOR THE
PROTECTION OF FREE EXPRESSION,
    *Amicus Supporting Appellees.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
John A. Gibney, Jr., District Judge.
(3:12-cv-00367-JAG)

Argued: March 20, 2013

Decided: May 29, 2013

Before KING, DIAZ, and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Diaz and Judge Floyd joined.

## COUNSEL

**ARGUED:** Earle Duncan Getchell, Jr., OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. Rebecca Kim Glenberg, AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF VIRGINIA, Richmond, Virginia, for Appellees. **ON BRIEF:** Kenneth T. Cuccinelli, II, Attorney General of Virginia, Michael H. Brady, Assistant Attorney General, Patricia L. West, Chief Deputy Attorney General, Wesley G. Russell, Jr., Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellants. J. Joshua Wheeler, THE THOMAS JEFFERSON CENTER FOR THE PROTECTION OF FREE EXPRESSION, Charlottesville, Virginia, for Amicus Supporting Appellees.

## OPINION

KING, Circuit Judge:

In the spring of 2012, the Libertarian Party of Virginia (the "LPVA") began to circulate petitions throughout the Commonwealth in the hope of collecting enough signatures to place its national candidate for President of the United States on the ballot for the November general election. To achieve ballot access for its candidate, the LPVA was required to obtain the signatures of 10,000 qualified Virginia voters, with each of the Commonwealth's eleven congressional districts contributing at least 400 signatures toward the total. *See* Va. Code § 24.2-543.[1] In accordance with Virginia law, signatures

---

[1] The LPVA must petition for ballot access pursuant to section 24.2-543 because it is not a "political party," defined as "an organization of citizens

on nominating petitions must be witnessed either by the candidate personally, or by a person who is a "resident of the Commonwealth and who is not a minor or a felon whose voting rights have not been restored" (the "witness residency requirement" or the "requirement"). *Id.*

On May 14, 2012, the LPVA, joined by Darryl Bonner, a Pennsylvania Libertarian and professional petition circulator (collectively, the "plaintiffs"), filed the underlying action in the Eastern District of Virginia, seeking injunctive and declaratory relief pursuant to 42 U.S.C. § 1983. The plaintiffs' verified Complaint alleges that the witness residency requirement impermissibly burdens their rights to free speech and free association under the First Amendment, as made applicable to the Commonwealth by the Fourteenth Amendment. The named defendants are the three members of the Virginia State Board of Elections (collectively, the "Board"), sued in their official capacities as administrators of the Commonwealth's election laws.

The plaintiffs explain that the LPVA uses both paid professionals and unpaid volunteers to circulate nominating petitions and collect signatures. *See* Complaint ¶ 15.[2] Only two of those professionals are LPVA members, *see id.* ¶ 16, and are thus permitted, on the basis of their Virginia residency, to attest to the signatures they collect. In contrast, nonresident professionals like Bonner must work in tandem with a resident of Virginia, whose sole purpose is to function as a witness. While circulating petitions in Virginia for the Green Party during 2008, Bonner "found that being accompanied by a non-professional Virginia resident significantly slowed the

---

of the Commonwealth which, at either of the two preceding statewide general elections, received at least 10 percent of the total vote cast for any statewide office filled in that election." Va. Code § 24.2-101.

[2] The Complaint is found at J.A. 7-16. (Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties to this appeal.)

4     LIBERTARIAN PARTY OF VIRGINIA v. JUDD

process down and inhibited his ability to communicate effectively with potential signatories." *Id.* ¶ 19.[3]

Consequently, according to the plaintiffs, the witness residency requirement "reduces the pool of circulators available," thereby rendering it more difficult for LPVA members "to disseminate their political views, to choose the most effective means of conveying their message, to associate in a meaningful way with the prospective solicitors for the purpose of eliciting political change, to gain access to the ballot, and to utilize the endorsement of their candidate" with respect to signature-collecting efforts. Complaint ¶ 21. Bonner is likewise adversely affected, the plaintiffs maintain, in that the requirement "restrict[s] the nature of support he can offer candidates, restrict[s] the type of speech he can engage in[,] . . . and restrict[s] his right to associate with the LPVA and with the candidates and voters of Virginia." *Id.* ¶ 22. These deleterious effects cause the witness residency requirement to fail strict scrutiny analysis under the First Amendment, the plaintiffs say, because it "is not narrowly tailored to further a compelling government interest." *Id.* ¶ 33.

The plaintiffs filed their Complaint about three months in advance of the deadline for the LPVA to submit signatures. In light of the time-sensitive nature of the dispute, the district court conducted a conference call with the parties on May 22, 2012, directing that discovery immediately commence and be completed within thirty days. The Board answered the Complaint on May 25, 2012, denying that the plaintiffs were entitled to redress. Following the close of discovery, on June 21, 2012, the parties filed cross-motions for summary judgment,

---

[3]Bonner elaborated during discovery that, during the 2008 petition drive, his witness-partners occasionally "wanted to take a break when I wanted to continue working. Witnesses sometimes interrupted my communication to potential signatories to state their own opinions, which sometimes invited argument from the potential signatory and sometimes caused the potential signatory to decide not to sign the petition." J.A. 109.

with the Board's motion premised entirely on its assertion that the plaintiffs have not suffered a legally cognizable injury and thus lack standing to sue.

On July 30, 2012, the district court issued a Memorandum Opinion in conjunction with a conforming Order, in which it denied the Board's motion as to standing and granted the plaintiffs' motion on the merits. The court therefore declared the witness residency requirement unconstitutional and permanently enjoined its enforcement.[4]

Subsequently, on August 13, 2012, the court denied the Board's motion to stay the Order pending appeal. The Board noticed this appeal the following day, and it moved us for a stay on August 24, 2012, the deadline for the LPVA to submit its petitions. Thereafter, on September 6, 2012, we denied the requested stay. The parties then proceeded to brief the issues identified for appeal, and they presented oral argument on March 20, 2013. Having now fully considered the submissions and arguments of the parties, we affirm in all respects the judgment of the district court.

---

[4]The district court's Order provided, in pertinent part, that "the defendants and their successor members of the Virginia State Board of Elections are hereby PERMANENTLY ENJOINED from enforcing the state residency requirement with respect to the circulation of petitions for independent candidates for the Office of President of the United States." Order 1. Although "[f]acial challenges are disfavored," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008), they are permitted on overbreadth grounds "because the 'statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.'" *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 441 (2013) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). Nevertheless, "'a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications.'" *Hardwick*, 711 F.3d at 426 (quoting *New York v. Ferber*, 458 U.S. 747, 771 (1982)). The Board does not contend that, if the witness residency requirement is declared unconstitutional, such declaration should be confined solely to the requirement's application to the plaintiffs.

### I.

We review de novo the district court's disposition of the cross-motions for summary judgment, evaluating them seriatim. *See Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011). With respect to both motions, we are required to view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party, in order to determine whether "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Woollard v. Gallagher*, 712 F.3d 865, ___ (4th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). A dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). A fact is material if it "'might affect the outcome of the suit under the governing law.'" *Henry v. Purnell*, 652 F.3d 524, 548 (4th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

### II.

We first examine the district court's ruling denying summary judgment to the Board, whose motion contended that the plaintiffs were bereft of standing to sue and, thus, that the court was without jurisdiction over the dispute. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("'On every writ of error or appeal, the first and fundamental question is that of jurisdiction.'") (quoting *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900)). Standing is part and parcel of the constitutional mandate that the judicial power of the United States extend only to "cases" and "controversies." U.S. Const. art. III, § 2; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.").

Constitutional standing comprises three elements: (1) the plaintiff is required to have sustained an injury in fact; which

LIBERTARIAN PARTY OF VIRGINIA v. JUDD    7

(2) must be causally connected to the complained-of conduct undertaken by the defendant; and (3) will likely be redressed if the plaintiff prevails. *See Lujan*, 504 U.S. at 560-61. The burden of establishing each element is on the plaintiff, which, in the context of this appeal, requires the "set[ting] forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* at 561 (citation and internal quotation marks omitted). In challenging the district court's adverse ruling on its summary judgment motion, the Board maintains that neither the LPVA nor Bonner has sufficiently demonstrated the existence of a threshold injury in fact.

A.

The Board portrays the LPVA's First Amendment claim as grounded in the latter's anxiety that its resident petition circulators might become incapacitated such that it would be compelled to replace either or both — if at all — with nonresident circulators made less efficient by the witness residency requirement. *See* Complaint ¶ 16 ("In past campaigns, these two people have been responsible for collecting a significant number of the required signatures. If either of them were to take ill or otherwise become unavailable, the LPVA would be unlikely to be able to collect the required 10,000 signatures."). Pointing out that the LPVA has succeeded in placing its presidential candidate on the Virginia ballot since 1992, *see* J.A. 92, and that both resident circulators were actively collecting signatures throughout the 2012 petition period at least until the close of discovery, *see id.* at 81, the Board depicts the mere threat of changed circumstances as impermissibly "'conjectural or hypothetical,'" and not the "'actual or imminent'" injury necessary to satisfy the standing requirement. *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (citation and internal quotation marks omitted)). The Board's characterization, insofar as it misperceives the essence of the petition circulation process,

too narrowly circumscribes the proper contours of the LPVA's claim.

In *Meyer v. Grant*, a unanimous Supreme Court determined that petitions "of necessity involve[ ] both the expression of a desire for political change and a discussion of the merits of the proposed change." 486 U.S. 414, 421 (1988). Indubitably, restrictions on this sort of "core political speech" can affect the ultimate goal of ballot access. *Id.* at 422-23 (deducing that Colorado statute criminalizing the payment of petition circulators "makes it less likely that [proponents of an initiative measure] will garner the number of signatures necessary to place the matter on the ballot"). Although the LPVA has yet to fail in its quadrennial quest to gather sufficient signatures in Virginia on behalf of its party's presidential candidate, the Board's exclusive focus on those past successes ignores the means by which that end has been, and is, achieved. *Cf. Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 192 (1999) (affirming invalidation of Colorado initiative petition enactments as "significantly inhibit[ing] communication with voters about proposed political change").[5]

Mindful of the Court's analysis in *Meyer*, we observe that those circulating nominating petitions need not succeed in

---

[5]Though the decisions in *Meyer* and *Buckley* each involved challenges to laws governing initiative petitions and not nominating petitions, the Supreme Court noted in the latter case that "[i]nitiative-petition circulators . . . resemble candidate-petition signature gatherers . . . , for both seek ballot access." *Buckley*, 525 U.S. at 191. In *Nader v. Blackwell*, the court of appeals mused that "[t]here appears to be little reason to limit *Buckley*'s holding to initiative-petition circulators . . . . Indeed, common sense suggests that, in the course of convincing voters to sign their petitions, candidate-petition circulators engage in at least as much interactive political speech — if not more such speech — than initiative-petition circulators." 545 F.3d 459, 475 (6th Cir. 2008) (internal quotation marks omitted); *see also Lux v. Judd*, 651 F.3d 396, 403 n.5 (4th Cir. 2011) (discerning no meaningful distinction, for purposes of First Amendment analysis, between initiative petitions and nominating petitions, nor between circulators of petitions and witnesses thereto).

LIBERTARIAN PARTY OF VIRGINIA v. JUDD 9

convincing potential signatories that the candidate will prevail, but the circulators "will at least have to persuade them that [the candidate] is . . . deserving of the public scrutiny and debate that would attend . . . consideration by the whole electorate." 486 U.S. at 421. Almost invariably, this will "involve an explanation of the nature of the proposal," e.g., the candidate's political views or the party's platform, "and why its advocates support" them. *Id.* Taking as true the uncontested averments of the plaintiffs, we cannot help but agree that the witness residency requirement inevitably "limits the number of voices who will convey [the] message and hours they can speak and, therefore, limits the size of the audience they can reach." *Id.* at 422-23.[6]

---

[6]The verified Complaint faithfully tracks the concerns expressed by the Supreme Court in *Meyer*, alleging, among other things, that the witness residency requirement "reduces the pool of circulators available to support the LPVA's presidential candidate[,] placing a severe burden on the candidate's and the LPVA's First Amendment rights by making it more difficult for them to disseminate their political views [and] to choose the most effective means of conveying their message." Complaint ¶ 21. Bruce Majors, a Washington, D.C. resident, submitted an affidavit on behalf of the LPVA in opposition to the Board's motion for summary judgment, in which he stated that, but for the requirement, he would have volunteered as a petition circulator and organized other volunteers during the 2012 campaign. *See* J.A. 155. In a separate affidavit filed at the same time, William Redpath, a former Chair of the Libertarian National Committee, confirmed that elimination of the requirement would afford the LPVA "more control over its own messaging and over the logistical details of its ballot access drives." *Id.* at 152.

The Board maintains that these eleventh-hour affidavits asserted for the first time "a present interest in engaging non-resident circulators, fundamentally altering LPVA's claim of legal injury," in stark juxtaposition to the more speculative prospect of the party failing to amass sufficient signatures in some future election. Br. of Appellants 23. According to the Board, the affidavits should be disregarded insofar as they contradict the prior sworn allegations of the Complaint. *See, e.g., In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011) (reciting "well established" rule that party cannot avoid adverse entry of summary judgment by attempting to conjure genuine issue of fact through self-serving affidavit that conflicts with prior testimony). Nonetheless, "for the rule . . . to apply, there must be a bona fide inconsistency." *Spriggs v. Diamond Auto Glass*,

| 10 | LIBERTARIAN PARTY OF VIRGINIA v. JUDD |
|---|---|

It is therefore immaterial that the LPVA can, in spite of the witness residency requirement, circulate its petitions to enough of the electorate to permit the collection of 10,000 signatures, if it is also true that, absent the requirement, the petition circulators could approach and attempt to persuade an even larger audience. An encumbrance thus alleged, whose presence is properly evidenced on summary judgment, constitutes an injury in fact for standing purposes.

B.

The Board also contests Bonner's standing, but its challenge steers a slightly different tack than that taken with the LPVA. Bonner disclosed, by way of background, that he has been a professional petition circulator and canvasser since about 1993, and that he is the CEO of his own company, Central Petition Management. *See* J.A. 111-12. Bonner has collected signatures all across the country, deriving substantial income from his efforts. *See id.* at 112-17, 121. He recalled having circulated nominating petitions in Virginia in at least two elections prior to 2012, *see id.* at 109, and Bonner "considers his work an important means of expressing his belief that third-party candidates play a significant role in the political system and should be allowed a place on the ballots," Complaint ¶ 18.

Bonner, however, revealed at his deposition that an injury to his right knee for which he would require surgery had scotched his immediate plans to circulate petitions for the LPVA. *See* J.A. 132-33. Though it concedes that "Bonner's theory of [constitutional] injury could on its face support his case," Br. of Appellant 22, the Board insists that Bonner's

---

242 F.3d 179, 185 n.7 (4th Cir. 2001). No such inconsistency is present here, in that the affidavits merely detail and lend context to the nature of the LPVA's injury, which the Complaint sets forth in general terms by allusion to *Meyer*.

Case 3:12-cv-00367-JAG-DJN Document 35 Filed 05/29/13 Page 11 of 16 PageID# 377

physical incapacity to engage in protected speech and association in Virginia with respect to the 2012 campaign trumps the legal incapacity that would otherwise be imposed by the witness residency requirement.

The Board couches its argument against Bonner's standing in terms of imminency, relating to the threshold presence of an injury in fact, but we think it plain that the objection is more appropriately characterized as one concerning the second *Lujan* element, that of causation. Fulfillment of that element necessitates only that the alleged injury be "'fairly traceable'" to the complained-of action. *See MacDonald v. Moose*, 710 F.3d 154, 161-62 (4th Cir. 2013) (quoting *Lujan*, 504 U.S. at 560-61 (internal citation omitted)). Imposition of the stringent proximate cause standard, derived from principles of tort law, has been held to "wrongly equate[ ] injury fairly traceable to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). The Supreme Court has therefore recognized the concept of concurrent causation as useful in evaluating whether the pleadings and proof demonstrate a sufficient connection between the plaintiff's injury and the conduct of the defendant, such that a court ought to assert jurisdiction over the dispute.

Thus, if the witness residency requirement is at least in part responsible for frustrating Bonner's attempt to fully assert his First Amendment rights in Virginia, the causation element of *Lujan* is satisfied, and he can attempt to hold the Board accountable notwithstanding the presence of another proximate cause. In that vein, it is well to remember that Bonner's claim is not that the requirement has precluded him, as a nonresident of Virginia, from circulating nominating petitions at all, but that he may only do so when accompanied by a resident witness.

Whereas a knee ailment like the one afflicting Bonner would have disabled any circulator or witness without regard

| 12 | LIBERTARIAN PARTY OF VIRGINIA v. JUDD |
|---|---|

to residency, the law of which Bonner complains targets him and others of his ilk with laser precision; consequently, Bonner's legal disability relates more closely to his asserted injury than does his physical infirmity. Moreover, Bonner's medical condition is ephemeral and, presumably, will have sufficiently improved by 2016, but if the witness residency requirement then remains on the books, he will yet be prohibited from circulating petitions unencumbered. Lastly, we imagine that Bonner could have overcome his uncooperative knee long enough to sit down on a street corner and solicit passersby for a few signatures (he did, after all, manage to attend his scheduled deposition). Had that happened, Bonner undoubtedly would not have been as effective as when healthy, but his limited efficacy would have been even further hindered by the presence of a resident witness.

There is substantial basis, then, to conclude that, when it comes to encumbrances upon Bonner's exercise of his First Amendment rights, the witness residency requirement and his medical infirmity are, to a discernible degree, complementary of each other. The latter did not supplant the former in the chain of causation. We can therefore say with a modicum of confidence that the requirement is a concurrent cause of Bonner's alleged constitutional injury.[7]

### III.

We next consider the district court's award of summary judgment to the plaintiffs on the merits of their claims. As the law has developed following the Supreme Court's decisions

---

[7]We note finally that, so long as either the LPVA or Bonner has demonstrated the requisite standing, we possess jurisdiction to decide the constitutional question before us and determine the propriety of declaratory and injunctive relief. *See Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977) (observing that presence of "at least one . . . plaintiff who has demonstrated standing" obviated the need to "consider whether the other . . . plaintiffs have standing to maintain the suit").

in *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. American Constitutional Law Foundation*, 525 U.S. 182 (1999), a consensus has emerged that petitioning restrictions like the one at issue here are subject to strict scrutiny analysis. *See Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir. 2008) (applying strict scrutiny to overturn Oklahoma prohibition on nonresident circulators of initiative petitions); *Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008) (declaring unconstitutional, as failing strict scrutiny, Ohio ban on nonresidents circulating nominating petitions); *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008) (invalidating, pursuant to strict scrutiny analysis, Arizona deadline and residency provisions relating to nominating petitions and circulator-witnesses). The Ninth Circuit in *Brewer* recited the general rule that "the severity of the burden the election law imposes on the plaintiff's rights dictates the level of scrutiny applied by the court." 531 F.3d at 1034 (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).

Hence, "an election regulation that imposes a severe burden is subject to strict scrutiny and will be upheld only if it is narrowly tailored to serve a compelling state interest." *Brewer*, 531 F.3d at 1035 (citing *Burdick*, 504 U.S. at 434). The triumvirate of 2008 decisions in *Savage*, *Blackwell*, and *Brewer* demonstrate a general agreement among our sister circuits that residency restrictions bearing on petition circulators and witnesses burden First Amendment rights in a sufficiently severe fashion to merit the closest examination. *But see Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 616 (8th Cir. 2001) (upholding North Dakota proscription against nonresident initiative-petition circulators because "the regulation does not unduly restrict speech").

The Board contests the application of strict scrutiny only insofar as it presses its contention that the LPVA's assertion of injury can only be deemed contingent upon future circumstances, i.e., the sudden unavailability of resident circulators. The severity of the burden imposed by the witness residency requirement, according to the Board, is thereby attenuated

commensurately. Having rejected the Board's position in connection with its argument that the LPVA lacks standing, we deem it equally without force on the merits. Strict scrutiny is the proper standard.

A.

The Board maintains that the witness residency requirement serves the Commonwealth's interest in policing fraud potentially permeating the electoral process, in that: (1) it is less difficult to confirm the identities of resident witnesses, and thereby ensure they are qualified by age and not disqualified by felon status; (2) witness residents in Virginia are subject to being subpoenaed by the authorities to answer questions under oath concerning the circulation process, or to be prosecuted for criminal activity; and (3) residents are simply easier to locate for investigatory or prosecutorial purposes. The plaintiffs do not seriously dispute that the prevention of election fraud is a compelling state interest. *See Savage*, 550 F.3d at 1028 (assuming, arguendo, that state had a "compelling interest in protecting and policing both the integrity and the reliability of its initiative process"); *Brewer*, 531 F.3d at 1037 ("A state's interest in ensuring the integrity of the election process and preventing fraud is compelling." (citation omitted)); *Jaeger*, 241 F.3d at 616 (recognizing state's "compelling interest in preventing fraud").

B.

The more substantial question, and the crux of this appeal, is whether the Commonwealth's enactment banning all non-residents from witnessing nominating petitions — a measure we presume to be effective in combatting fraud — is, notwithstanding its efficacy, insufficiently tailored to constitutionally justify the burden it inflicts on the free exercise of First Amendment rights. *See Krislov v. Rednour*, 226 F.3d 851, 863 (7th Cir. 2000) ("[W]e must take into account . . . other, less restrictive means [the state] could reasonably employ[, though

it] need not use the least restrictive means available, as long as its present method does not burden more speech than is necessary to serve its compelling interests." (citations omitted)). The Board insists that the integrity of the petitioning process depends on "state election official access to the one person who can attest to the authenticity of potentially thousands of signatures," Br. of Appellants 34, access made more difficult, perhaps, if the witness resides beyond the subpoena power of the state.

The plaintiffs counter that the Commonwealth could compel nonresidents, as a condition of witnessing signatures on nominating petitions, to enter into a binding legal agreement with the Commonwealth to comply with any civil or criminal subpoena that may issue. Indeed, "[f]ederal courts have generally looked with favor on requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena enforcement, and the courts have viewed such a system to be a more narrowly tailored means than a residency requirement to achieve the same result." *Brewer*, 531 F.3d at 1037 (citing, inter alia, *Chandler v. City of Arvada*, 292 F.3d 1236, 1242-44 (10th Cir. 2002); *Krislov*, 226 F.3d at 866 n.7). More recently, in *Savage*, the Tenth Circuit reiterated that "requiring non-residents to sign agreements providing their contact information and swearing to return in the event of a protest is a more narrowly tailored option." 550 F.3d at 1030.[8]

According to the Board, ostensible consent to the extraterritorial reach of the Commonwealth's subpoena power does not guarantee the requisite access, because nonresident witnesses must yet be located and retrieved, perhaps by extradition or rendition. There are few guarantees in life, however, and it is hardly an iron-clad proposition that a similarly situated resi-

---

[8]Such an agreement might also require prospective witnesses to attest to their fitness to serve and, with respect to both residents and nonresidents, supply such proof of eligibility as may be deemed sufficient.

dent witness will be amenable to service and comply with a lawfully issued subpoena.

Simply stated, the Board has produced no concrete evidence of persuasive force explaining why the plaintiffs' proposed solution, manifestly less restrictive of their First Amendment rights, would be unworkable or impracticable. *See Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004) ("[T]he burden is on the Government to prove that the proposed alternatives will not be as effective as the challenged statute."). Surely nonresidents with a stake in having the signatures they have witnessed duly counted and credited — whether that stake be political, financial, or otherwise — will possess the same incentive as their resident counterparts to appear at the Commonwealth's request and answer any questions concerning the petitioning process.

Having fallen short of adducing the quantum of proof necessary to place into issue the relative effectiveness of the plaintiffs' proposed alternative to the patently burdensome witness residency requirement, the Board cannot prevail. Given the facts as developed below and viewed in the proper light, we have scant choice but to conclude, as the district court did, that the requirement fails strict scrutiny and is unconstitutional.

IV.

Pursuant to the foregoing, the judgment of the district court is affirmed.

*AFFIRMED*